IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,                    No. CR-S-10-175 KJM

    vs.

WQAS KHAN,                    ORDER

        Defendant.

_____/

        The pending motions were motivated by a search warrant and affidavit that serve as a prime negative example of documentation presented in seeking a court order to invade that most protected of spaces, a personal residence.  The warrant affidavit, submitted to a state Superior Court magistrate, is rambling and difficult to comprehend in its totality, which has burdened this reviewer with the teeth-gnashing task of determining whether the requirement of particularity was satisfied so as to support the challenged searches that occurred in 2009.  The government, which accepted prosecution of the case, complicated matters and stoked suspicions of a *Franks* violation by realizing, only after the defense filed its motions and an evidentiary hearing had begun, that the discovery it had produced was at best incomplete, at worst misleading.  The court ultimately concludes, after a careful and searching review of the record and considered reading of the applicable law, that the defense motions for the most part must be

1    denied.  The court's conclusion, however, should not be read as condoning in any respect the

2    quality of the workmanship represented by the search warrant and affidavit, or the delayed

3    manner in which the government ultimately provided full discovery of relevant information.  The

4    failure of the government – including state law enforcement officials with whom federal law

5    enforcement has cooperated -- to meet the highest standards in this matter has resulted in the

6    expenditure of innumerable hours in court time and judicial resources, by a court that has many

7    other litigants vying for its attention.  The court makes a point of articulating the problems here

8    in order to deter their recurrence and increase the chances that future litigation of this sort either

9    can be avoided or better focused only on the disputes that ultimately require the court's

10   resolution.

11   I. PROCEDURAL BACKGROUND

12            Defendant Wqas Khan is charged with violations of 21 U.S.C. § 841(a)(1) and

13   18 U.S.C. § 924(c)(1).  Some of the evidence in this case was gathered during searches of 127 E.

14   Noble Street and 3371 Penelope Street, both in Stockton, undertaken as part of the investigation

15   of the murder of Ryan Flores.  These searches were authorized by a warrant issued by Magistrate

16   McFadden of the Stanislaus County Superior Court on December 2, 2009, based on an affidavit

17   prepared by Kirk Bunch, an investigator with the Stanislaus County District Attorney's Office.

18            Defendant has filed two motions challenging the searches in this case.  The first, a

19   motion to quash the search warrant, alleges the warrant lacks the particularity required by the

20   Fourth Amendment.  The second, a motion to traverse the warrant under *Franks v. Delaware*,

21   438 U.S. 154 (1978), alleges that affiant Bunch intentionally or recklessly omitted information or

22   included incorrect information in the affidavit supporting the search warrant.  Defendant does

23   not challenge probable cause to search for evidence relating to the murder of Ryan Flores and, as

24   noted below, has waived his argument that the warrant was overbroad.

25            The court granted defendant's request for an evidentiary hearing on his motion to

26   traverse the warrant on the following topics: (1) differences between reports of surveillance of

2

1  Miranda Espinoza and the stop report generated by the GPS tracking equipment; (2) the

2  differences, if any, between the affidavit's account of contacts with "Rabbit" and the reports of

3  interviews with that source; (3) whether Bunch was present at the initial in-person interview of

4  Espinoza; (4) the circumstances surrounding Espinoza's mentioning defendant to law

5  enforcement; (5) the circumstances surrounding Espinoza's advising law enforcement that

6  defendant hit Flores on Halloween 2009; (6) Bunch's handling of the warrant and supporting

7  affidavit after Magistrate McFadden signed it on December 2, 2009; and (7) Bunch's presence

8  during the execution of the warrant at 127 E. Noble Street.  ECF No. 143.  The court took

9  evidence over the course of three days:  May 15, May 21, and June 19, 2012.

10         The parties submitted closing briefs and then supplemental briefs addressing the

11  court's questions about the warrant.  After considering the evidence and the parties' arguments,

12  the court GRANTS the motion to quash in part and DENIES it in part and DENIES the motion

13  to quash the warrant.

14  II.  THE WARRANT AND ITS EXECUTION

15         The warrant in this case authorized seizure of the following categories of

16  evidence; within each category, the warrant identifies many more items sought:

17         –any items tending to establish the identity of those with dominion
             and control over the premises;
18
           –any and all narcotics, dangerous drugs and paraphernalia related
19         to the use and sale of such drugs, including large sums of cash and
             firearms;
20
           –any and all cocaine or cocaine base and paraphernalia commonly
21         associated with the possession, packaging and/or sale of cocaine
             including large sums of cash and firearms;
22
           –any and all marijuana and paraphernalia commonly associated
23         with the possession, packaging and/or sale of marijuana;

24         –any property or items used for the cultivation of marijuana,
             including firearms and large sums of cash;
25
           –any and all firearms, including all ammunition for such weapons;
26

–any and all property, clothing, or items belonging to the victim and any trace evidence, such as blood, body fluids, hair and human tissue;

–any cleaning chemicals or cleaning devices that could be used to remove evidence of injury;

–all clothing material with possible blood stains.  Any medical or dental records, hospital records and/or billings.  Instrumentalities, trace evidence, or any other evidence of crimes as yet unknown.

-any and all clothing, including black gloves and black ski masks;

–any and all shoes along with shoe impressions located inside vehicles with any possible blood stain evidence;

–DNA swabs from Wqas Khan;

--any evidence of street gang membership, such as any paraphernalia making any reference to the "Norteno" street gang and "photographs . . . depicting persons, vehicles, weapons, and/or locations to be relevant on the question of gang membership or association, which depict items sought in this Search Warrant, and/or which depict evidence of any criminal activity"; [1]

–any newspaper clippings referring to crimes of violence;

–address books;

–all telephones;

–all electronic data processing and storage devices, computers and computer systems;

–all of the above records, "whether stored on paper, on magnetic media. . . or on memory storage devices. . . or any other storage media";

–computer or data processing software, stored on any type of medium;

/////

/////

/////

---

[1]  This category is included twice, along with a separate category for letters or documents making reference to street gang activities.

–"examination and search of all of the above components. . . for evidence."

Joint Exhibits (JEX),[2] Ex. A at 4-7.  The warrant also ordered several telecommunications companies to turn over records relating to several telephone numbers. *Id*. at 7-9.  The issuing magistrate directed that the "Search Warrant Affidavit/Statement of Probable Cause" (the Affidavit) be sealed and "kept in the custody of the Affiant's law enforcement agency and not be made part of the public record until further order of the court . . . ." *Id*. at 11.  The warrant itself does not identify the crime being investigated; the boxes checked at the beginning of the form identify the objects of the search as property or things related to the commission of a felony. *Id*. at 3.  The warrant does include the following language:  "proof by affidavit, having been this day made before me by Peace Office Kirk B. Bunch . . ." JEX A at 1.  And it concludes:  "This Search Warrant and Affidavit and attached and incorporated Statement of Probable Cause were sworn to as true . . ." JEX A at 9.

The Affidavit is a forty-seven-page stream-of-consciousness narrative about a homicide investigation, that indicates a belief that California Penal Code § 187(a), felony murder, has been violated.  JEX, Ex. B.  The affidavit describes the early morning shooting of Ryan Flores on Boothe Road in Ceres[3] on November 22, 2009. *Id*. at 3.  Police who responded to the scene learned that witnesses heard gunshots and saw two Hispanic males carrying duffel bags and running to a Mitsubishi Lancer after the shooting. *Id*. at 5.  They recovered 9 mm shells from inside 2021 Boothe Road, where Flores had collapsed on the porch. *Id*. at 5-6.  In addition, police found a key in the front door of 2026 Boothe Road, other keys in the street, and

---

[2] These were submitted in connection with the original motions and are in the record at ECF Nos. 112 & 113.

[3] The Affidavit includes the following facts, which have little or nothing to do with the ultimate search:  that Flores was carrying a driver's license in the name of Anthony Gibson and that police notified Gibson's mother that her son was dead before learning that the homicide victim was Ryan Flores.  JEX, Ex. B at 3.

1   foot impressions in the wet grass leading to 2021 Boothe.  *Id*. at 4.  The resident of 2021 Boothe

2   reported hearing a cell phone ringing as Flores lay dying; police found a cell phone near Flores's

3   body.  *Id*. at 5.

4          Police learned that the rental contract on 2026 Boothe Road was in Miranda

5   Espinoza's name.  *Id*. at 8.  During the execution of a warrant at 2026 Boothe Road, Bunch

6   answered a ringing cell phone police found in the house.  *Id*. at 9.  After some hesitation, the

7   caller identified herself as Espinoza, said that her boyfriend and his friend stayed at the house,

8   but that she did not, even though her name was on the lease.  *Id*.  Espinoza was reluctant to

9   identify her boyfriend even though Bunch told her he was investigating a serious crime.  *Id*. at

10  10.  Espinoza asked if her boyfriend was dead; Bunch countered that he may have been "severely

11  injured."  Espinoza showed no emotion.  She finally identified her boyfriend as Ryan Flores and

12  his friend as "Rabbit."  *Id*.  Officers found marijuana, scales, pay-owe sheets, packaging

13  materials, and guns at 2026 Boothe.  *Id*.

14         Later on the morning of November 22, 2009, Officers Greibel and Perry talked to

15  Espinoza at 127 E. Noble Avenue in Stockton and advised her that Flores was dead.  *Id*.  She

16  went with them to the Ceres Police Department.  *Id*. at 11.  Before leaving, Perry saw a dry erase

17  board in Espinoza's bedroom with Norteno graffiti, which Espinoza attributed to a cousin.  *Id*.

18         At the police station, Espinoza said she had been out clubbing the night before

19  and was supposed to meet up with Flores later; she had last communicated with him close to

20  1:00 a.m. on November 22, when she received a text.  *Id*.  She said she was not as close to Flores

21  as she had been because he was sometimes violent toward her and because he was dating a

22  stripper; she denied dating anyone else "who might have issues with him."  *Id*. at 12, 13, 14, 15,

23  22.  She told the officers she had seen Flores on November 20, 2009, when he took her and her

24  /////

25  /////

26  /////

1   daughter to the mall; this was the first time they had spent time together in a few months.  *Id.* at

2   16.[4]

3          Espinoza said she had told Rabbit there had been a shooting but also that she

4   thought Flores might be in jail.  She provided two phone numbers for Rabbit, whom she

5   identified as Flores's right hand man.  *Id.* at 12, 14, 17.

6          Espinoza also told Perry and Greibel about an associate of Flores, someone

7   named Fernando, who was robbed and shot.  *Id.* at 13, 14, 19.  Bunch learned from a San Joaquin

8   County Sheriff's Detective about a home invasion robbery on November 13, 2009: three men

9   broke into the home of a man named Franco Valdez, asked for money, threatened to shoot his

10  baby and then shot him.  *Id.* at 24.  Valdez believed the men were Nortenos because of their use

11  of slang.  *Id.* at 25.  McCullough reported that Flores and Valdez were business associates and

12  there were rumors that Espinoza had set up Valdez.  *Id.*

13         Bunch and Detective Yandell of the Ceres Police Department interviewed

14  R. Urrea, the mother of one of Flores's children.  *Id.* at 23.  Flores had told Urrea that he had

15  been in a fight over Espinoza on Halloween at a Modesto nightclub.  *Id.* at 23-24.  Urrea told

16  Bunch she believed Espinoza was involved in the murder.  *Id.*

17         At some point, William Fry, the person known as Rabbit, called Bunch, and

18  provided information about his association with Flores.  *Id.* at 24.  Fry said he provided

19  transportation and protection for Flores and his drug shipments.  *Id.* at 25.  Fry was suspicious of

20  Espinoza, who told Flores where her ex-boyfriends kept their drugs, as though encouraging

21  Flores to rob other drug dealers.  *Id.*  He also felt Flores was spending too much money on

22  Espinoza and too much time with her, and had rashly shown her "everything, which caused him

23  some concern."  *Id.*  As a result, Fry broke off communication with Flores for a while.  *Id.* at 26.

24  /////

25  ─────────────────

26          [4]  The Affidavit includes the details Espinoza provided about Flores's drug-dealing, his
        associates, and his threats against his friends and girlfriends.  *See, e.g.*, JEX, Ex. B at 15, 21.

1    When Fry returned to Flores's employ, sometime in August 2009, they set up

2  several houses "where they conducted business." *Id*. In late September 2009, one of Flores's

3  drug houses was burglarized, with both money and drugs taken.  Fry suspected that Espinoza had

4  set up the burglary because she was the only one outside of their inner circle who knew about the

5  house.  *Id*. at 25.

6    Flores told Fry that Flores was in a club on Halloween when Espinoza and

7  another man came in.  When Flores pushed Espinoza, her companion slugged Flores in the face

8  and took Flores's diamond necklace.  *Id*. at 27.  Flores later learned the man goes by the name

9  Wqas.  *Id*.  Fry also reported that Flores and Wqas exchanged threats on the telephone; the call

10  ended with Wqas telling Flores "he was going to smoke him."  *Id*.  Fry made inquiries on the

11  street and

12  learned that Wqas was a Norteno and "was not the type of guy to mess with."  *Id*.  Sometime

13  later Flores and Wqas talked on the phone again and Wqas told Flores "that it was still on."  *Id.*[5]

14    Bunch called Espinoza on November 24 and asked her why she had not

15  mentioned the fight in the club on Halloween; she said she did not think it was important.  *Id*. at

16  28.  She claimed she had gone to the club with her girlfriends and "some random unknown guy"

17  hit Flores after Flores hit her.  When Bunch asked if the "random unknown guy" was Wqas, she

18  said yes.  *Id*.

19    Later that day Officer Perry called Espinoza, who said that Wqas did not hit

20  Flores and it was a man named Zobb who did.  Espinoza said she had not seen Wqas for two

21  weeks because she did not like the way he treated her.  *Id*. at 29.

22    Bunch gained access to Espinoza's MySpace page and saw a picture of her with

23  one male, all in red, flashing gang signs and another picture with Wqas, the defendant in this

24

25    [5] Fry also heard that Juan Alvarez "had an issue" with Flores over Espinoza, though why
   Bunch included this information in the affidavit is unclear.  *Id*. at 27.

26

1   case.  *Id*.  Urrea told Bunch that after November 24, Espinoza had removed the picture of

2   defendant.  *Id*.

3          Bunch located a Stockton Police Department report documenting that on

4   October 9, 2009, Officer Hamblin received information that a Middle Eastern male, "Quas," who

5   was an active Norteno gang member, was in possession of illegal guns.  At some point, police

6   had recovered several illegal firearms, an explosive device and some narcotics from 1403 Sutra

7   Avenue, where "Quas" was renting a room.  *Id*. at 30.  The owner said the illegal materials

8   belonged to "Quas"; police lifted one of defendant's fingerprints from a Redbull can found in the

9   room where the guns and narcotics were located.  *Id*.

10         Flores's phone showed a number of texts from Espinoza, including one right

11  around the time Flores was shot.  *Id*. at 31.

12         On November 23, 2009, police established surveillance of Espinoza "in order to

13  confirm or disprove [her] original statement provided on 11-22-2009, that her [*sic*] and W.

14  KHAN had no relationship and that she had not seen him for approximately two weeks prior to

15  the murder of R. FLORES because she did not like how W. KHAN treated her."  *Id*. at 31.

16         The surveillance records showed that Espinoza parked her car near 3373 Penelope

17  Drive, identified as defendant's house, on several occasions beginning on November 23, and that

18  she stayed "at the residence" for varying times.  *Id*. at 31-32.

19         Sometime later the police undertook surveillance of defendant, noting that he

20  parked his car near Espinoza's house on E. Noble Street on several occasions, staying for

21  varying lengths of time.  *Id*. at 32.

22         Bunch then concluded that "[a]t this time, this affiant believes there is ample

23  amount of probable cause that currently exist [*sic*] and believes that there is evidence related to

24  this murder investigation along with drug sales, firearm violations present at 127 E. Noble Street

25  Stockton, California [and] 3371 Penelope Drive Stockton . . . ."  *Id*. at 32.  Bunch then relies on

26  his experience and his contact with other law enforcement officers to opine that gang members

1  keep records of all varieties documenting gang membership and activities, including crimes, *id*.

2  at 33; that evidence of gang membership "may suggest motive for the commission of crimes," *id*.

3  at 34; that gang members frequently have pictures or videos depicting them with weapons, *id*.;

4  that people who conspire to commit felonies coordinate their activities by telephone, *id*.; that the

5  people listed in the warrant are "engaged in an ongoing conspiracy to commit . . . Murder,

6  Armed Robbery, Firearm Violations, and Transportation/Sales of a [*sic*] illegal controlled

7  substance . . . ." *Id*. at 35.

8          At the evidentiary hearing that this court presided over, Bunch testified that after

9  the magistrate signed the search warrant on December 2, 2009, he put it in an envelope and then

10  put the envelope into a locked drawer of a filing cabinet in his office. 5/15 RT[6] 10; 5/21 RT 108-

11  109. He did not thereafter remove the affidavit from his locked file drawer until he filed the

12  warrant and affidavit with the Clerk of Stanislaus County Superior Court on December 21, 2009,

13  the same day the magistrate signed the return. 5/15 RT 10, 20; 5/21 RT 110.

14          The warrant was executed on December 2, 2009. 5/15/ RT 20. There was a

15  briefing about the search for those responsible for executing it at the Ceres Police Department

16  around 9:00 or 9:30 that morning "to discuss what the judge authorized for the search warrant."

17  5/15 RT 26. Bunch read aloud the things to be seized as listed in the warrant and his

18  investigation into the Flores homicide but did not read the affidavit for the assembled officers.

19  *Id*. at 26-27; 5/21 RT 38, 118; 6/19 RT 30. Bunch described this as a "quick briefing." 6/19 RT

20  29. He gave the officers who would be executing the warrant a packet of information including

21  rap sheets of those involved and photos of the locations. 5/21 RT 118. He did not provide each

22  searching officer a copy of the warrant or any other documents describing what should be seized.

23  *Id*. at 27.

24  /////

25  _____

26          [6] RT stands for Reporter's Transcript.  All three transcripts are filed in this case.  ECF Nos.
172, 177, 187.

1    Bunch initially participated in a traffic stop of Miranda Espinoza and did not

2  arrive at 127 E. Noble Street until the search was already underway, somewhere between 10:00

3  and noon, though he cannot be sure of the time.  5/15 RT 29; 5/21 RT 46.  He stayed there an

4  hour and a half to two hours.  5/15 RT 30.  He did not bring a copy of the affidavit with him nor

5  was he responsible for monitoring compliance with the warrant at 127 East Noble.  *Id*. at 31,

6  119.  When he arrived, he viewed the firearms and controlled substances that had been located

7  before he began his interview with defendant and then a follow up interview with Espinoza.  *Id*.

8  at 120.[7]

9  III.  ANALYSIS

10    A.  Reasonable Expectation Of Privacy

11    A defendant who claims that government action violated his Fourth Amendment

12  rights must, as a threshold matter, demonstrate that he had a "legitimate expectation of privacy"

13  in the place searched or the thing seized and that this expectation is one society recognizes as

14  legitimate.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  In this case the parties agree that 127 E.

15  Noble was Espinoza's house, that defendant was a frequent guest, and that he was asleep in the

16  home when the officers arrived to execute the warrant.  An overnight guest has a reasonable

17  expectation of privacy in his host's home and so has "standing" to challenge a search of the

18  premises.  *Minnesota v. Olsen*, 495 U.S. 91, 96, 98-99 (1990) ("To hold that an overnight guest

19  has a legitimate expectation of privacy in his host's home merely recognizes the everyday

20  expectations of privacy that we all share. Staying overnight in another's home is a longstanding

21  social custom that serves functions recognized as valuable by society . . . . [W]e think that

22  society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.");

23  *United States v. Gamez-Orduno*, 235 F.3d 453, 458 (9th Cir. 2000).

24  /////

---

25    [7] Bunch provided a copy of the warrant to Espinoza during his initial interview with her on
26  December 2.  5/21 RT 123.

B.  The Requirement Of Particularity

Defendant argues that the warrant does not particularly describe the evidence to be seized and is facially overbroad.  He adds that because the warrant does not identify the particular crimes under investigation, it provides no guidance for the officers' exercise of discretion.  He also argues that the particularity problems cannot be cured by reference to the Affidavit because that document was not incorporated into the warrant by reference.

The government counters that a generic description of the materials sought was permissible because a more precise description was not possible and also that the terms of the warrant channeled the executing officers' discretion and were "justified by the breadth of the probable cause established in the lengthy affidavit of Kirk Bunch."  ECF No. 128 at 2-3.  It also argues that any invalid portions are severable and that the search may be upheld under the good faith exception.

The Fourth Amendment requires that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. CONST. AMEND. IV.  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches . . . ."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also Andresen v. Maryland*, 427 U.S. 463, 479 (1976) ("This requirement makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (internal citation and quotation marks omitted)); *United States v. Leary*, 846 F.2d 592, 600 n.12 (10th Cir. 1988) ("The common theme of all descriptions of the particularity standard is that the warrant must allow the executing officer to distinguish between items that may and may not be seized.").  "[T]he presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity."  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).

1        There are two aspects to particularity: specificity and overbreadth.  "'Particularity

2   is the requirement that the warrant must clearly state what is sought.  Breadth deals with the

3   requirement that the scope of the warrant be limited by the probable cause on which the warrant

4   is based.'"  *United States v. SDI Future Health, Inc*., 568 F.3d 684, 702 (9th Cir. 2009) (quoting

5   *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-47 (9th Cir. 1991)); *United*

6   *States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1995).  A warrant's lack of specificity may be cured by

7   a specific description in the affidavit, so long as the affidavit is incorporated into the warrant and

8   is available to the agents who execute the search.

9        1.  Specificity

10       The Ninth Circuit has discussed the requirement of specificity in a number of

11  cases.  For example, in *United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986), officers executed

12  four search warrants at Spilotro's jewelry store and Blasko's home, person and safe deposit box,

13  seeking evidence of loan sharking and bookmaking.  The Ninth Circuit affirmed the district

14  court's decision suppressing the evidence because the warrants were "hopelessly general."  *Id*. at

15  960.  The warrants directed a search for several categories of evidence and "other items and

16  paraphernalia," which were evidence of violations of a list of thirteen federal statutes.  *Id*. at 961.

17  The Ninth Circuit agreed that the warrant was too general because the government could have

18  described "in greater detail the items one commonly expects to find on premises used for the

19  criminal activities in question, or at the very least, by describing the criminal activities

20  themselves . . . As the warrants stand, however, they authorize wholesale seizure of entire

21  categories of items not generally evidence of criminal activity and provide no guidelines to

22  distinguish items used lawfully from those the government had probable cause to seize."  *Id.* at

23  964.  The court noted that "[r]eference to a specific illegal activity can, in appropriate cases,

24  provide substantive guidance for the officer's exercise of discretion in executing the warrant."

25  *Id*.

26  /////

1      Similarly, in *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995), agents executed a

2   search warrant at HK Video's business offices and seized most of the business's records,

3   computer hardware and software, files, ledgers and invoices as part of an investigation of tax

4   evasion and fraud.  The court found the warrant lacked sufficient specificity because it

5   "contained no limitations on which documents within each category could be seized or suggested

6   how they related to specific criminal activity," and noted that "the warrant could have specified

7   the suspected criminal conduct."  *Id*. at 427.

8      The warrant in this case does not fit neatly into the category of the cases

9   discussing specificity cited by defendant, most of which deal with the seizure of documents or

10  other objects that might not be evidence of crime unless they were specifically described or tied

11  to a specific crime.  *See Kow*, 58 F.3d at 427 ("the government did not contain the scope of the

12  warrant by reference to limiting descriptions in the affidavit such as HK Video's tax

13  identification number"); *Spilotro*, 800 F.2d at 965 (a warrant authorizing the seizure of

14  "gemstones and other items of jewelry" provided no basis for distinguishing stolen gems from

15  others).  Rather, the warrant here authorized in part the seizure of drugs, guns, gang-related

16  paraphernalia, as well as documents in any form relating to gang activities.  In this case, the

17  officers knew that if they found an address book, they should seize it.  *See SDI Future Health*,

18  568 F.3d at 702 ("The officers could tell from the warrant that, should they happen upon a

19  rolodex, they should seize it.").  Moreover, the direction to seize drugs and other materials

20  relating to the sale of drugs hardly needs a reference to the crime being investigated to render the

21  direction specific.  In addition, the direction to seize "all of the above records" no matter how

22  stored directs the executing officer to seize the categories of documents identified whether they

23  are paper documents or stored on electronic media.

24      Other portions of the warrant, however, are not specific.  For example, the

25  warrant directs the officers to seize the victim's clothing, any and all clothing; any and all shoes

26  and shoe impressions; medical, dental or hospital records and/or billings, along with a "catch-

14

1   all" provision authorizing the seizure of evidence relating to unknown crimes.  As the warrant

2   itself did not identify a victim or otherwise define the crime being investigated, these portions of

3   the warrant authorized a "wide-ranging exploratory search" of clothing and personal records.  In

4   addition, because the "catch-all provision" is not tied to a particular crime, it too authorizes a

5   search for anything that might be an "instrumentality," however broadly interpreted, of any

6   crime.  Thus, this case is distinguishable from *Andresen*, which rejected a claim that the phrase

7   "'together with other fruits, instrumentalities and evidence of crime at this (time) unknown'"

8   rendered a warrant "fatally 'general.'"  *Andresen*, 427 U.S. at 479.  In *Andresen*, the Court said

9   that because the phrase was not a separate sentence, but rather appeared at the end of a sentence

10  "containing a lengthy list of specified and particular items to be seized, all pertaining to Lot

11  13T," it was "clear from the context that the term 'crime' in the warrants refers only to the crime

12  of false pretenses with respect to the sale of lot 13T."  *Id.* at 480-81.  It concluded that the

13  warrants, thus construed, did not authorize a general search for evidence of any crime but "only

14  to search for and seize evidence relevant to the crime of false pretenses and Lot 13T."  *Id*. at 482;

15  *see also United States v. Pindell*, 336 F.3d 1049, 1053-54 (D.C. Cir. 2003) (upholding warrant,

16  despite catch-all phrase, because the phrase was part of list of evidence relating to a particular

17  violation); *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982) (finding catch-all phrase

18  did not render warrant general when it was attached to list of items described "in both specific

19  and inclusive generic terms"); *United States v. Soto*, 779 F. Supp. 2d 208, 221 (D. Mass. 2011)

20  ("'[c]atch-all' clauses . . . which authorize the seizure of all 'other fruits, instrumentalities and

21  evidence of crime at this (time) unknown,' are acceptable if linked to specific criminal episodes

22  described in the warrant.").  This case instead is more like *United States v. George*, 975 F.2d 72,

23  75-76 (2d Cir. 1992), in which the court found the warrant's "broad authorization to search for

24  'any other evidence relating to the commission of a crime'" violated the particularity

25  requirement of the Fourth Amendment because the warrant itself did not identify the crime for

26  which the evidence was sought.  In this case, although the executing officers might guess at the

1   crime being investigated, the catch-all phrase was not attached to any specifically described

2   crime and so provided no context to inform interpretation of the catch-all phrase.  *See also*

3   *United States v. Adjani*, 452 F.3d 1140, 1148 (9th Cir. 2006) (finding warrant sufficiently

4   specific to restrict discretion of agents when it limited search of computer for evidence of

5   extortion).

6          A warrant's lack of specificity may be remedied by a sufficiently specific

7   description in the affidavit, so long as the affidavit is expressly incorporated into the warrant and

8   physically attached to or accompanies the warrant while agents search.  *SDI Future Health*,

9   568 F.3d at 699; *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993).  A warrant

10  incorporates the affidavit by using "suitable words of reference," for example, the phrase "*upon*

11  *the sworn complaint made before* me there is probable cause to believe" that the particular crime

12  has been committed.  *SDI Future Health*, 568 F.3d at 699-700 (internal quotation marks omitted;

13  emphasis in original).  The warrant in this case states that, "This Search Warrant and Affidavit

14  and attached and incorporated Statement of Probable Cause were sworn to as true and subscribed

15  before me. . . . Wherefore, I find probable cause for the issuance of this Search Warrant and do

16  issue it."  JEX A at 9.  These are suitable words of reference.

17          Despite the incorporation, however, executing officers did not have the Affidavit

18  with them while they searched: Bunch was adamant that once the warrant was signed, he locked

19  the Affidavit in the drawer of a filing cabinet in his office and did not remove it until he filed the

20  warrant, along with the return, in the Superior Court.  In addition, Bunch testified that once the

21  warrant was signed, he had a very short briefing session with the search teams during which he

22  read them only the language of the warrant, and then left in order to participate in the arrest of

23  Espinoza, sometime around 9:30 a.m.; he arrived at E. Noble only after the search was

24  underway.  His presence during a portion of the search does not make up for the absence of the

25  Affidavit at the search or otherwise serve as a mechanism to restrict the officer's discretion.

26  /////

2. Overbreadth

"A warrant must not only give clear instructions to a search team, it must also give legal, that is, not overbroad instructions.  Under the Fourth Amendment, this means that 'there [must] be probable cause to seize the particular thing[s] named in the warrant.'" *SDI Future Health, Inc*., 568 F.3d at 702 (quoting *In re Grand Jury Subpoenas*, 926 F.2d 847, 857 (9th Cir. 1991)).  Probable cause means that, based on all the circumstances in the affidavit, including the veracity and basis of knowledge of those who supplied hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 212, 238 (1983); *United States v. Tan Duc Nguyen*, 673 F. 3d 1259, 1264 (9th Cir. 2012).  Overbreadth thus often has little to do with the quantity of the material seized; there is no Fourth Amendment violation if the broad seizure is "'within the scope of probable cause underlying the warrant.'"  *SDI Future Health, Inc*., 568 F.3d at 703 (quoting *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986)).

While defendant raised both lack of specificity and overbreadth in his motion to suppress, he provided no analysis of his claim of overbreadth.  In response to the court's request for supplemental briefing on the question of overbreadth, defendant cited the general law on the subject but then argued only generally that the warrant "authorizes the wholesale seizures of entire categories of items and provides no guidelines to distinguish items the government had probable cause to seize."  ECF No. 193 at 3.  Defendant does not thereafter discuss the probable cause showing in the Affidavit or attempt to show how it did or did not support the seizure of the things described in the warrant itself.  Instead, he recycles his arguments about specificity and focuses on the wholesale nature of the seizures authorized by the warrant, which does not, by itself, establish overbreadth.  Because defendant has not supported his claim of overbreadth with argument, even after supplemental briefing, the court considers the claim waived.  *United States v. Hernandez*, 357 F. App'x 52, 53 (9th Cir. 2009) (finding an issue waived because defendant "failed to argue [it] beyond a cursory assertion"); *Ghahremani v. Gonzales*, 498 F.3d 993, 997

1  (9th Cir. 2007) ("Issues raised in a brief that are not supported by argument are deemed

2  abandoned.").

3       3.  Severability

4       The government argues that even if portions of the warrant in this case lack

5  particularity, those portions may be severed.  Defendant argues that the warrant is too general to

6  be apportioned into valid and invalid sections.

7       "The doctrine of severance requires that 'identifiable portions of the warrant be

8  sufficiently specific and particular to support severance.'" *United States v. Sears*, 411 F.3d 1124,

9  1130 (9th Cir. 2005) (quoting *Spilotro*, 800 F.2d at 967); *United States v. The Offices Known As

10 50 State Distributing Co.*, 708 F.2d 1371, 1376 (9th Cir. 1983) (recognizing that "selective

11 suppression" may be appropriate for items improperly seized).  However, "'[i]f no portion of the

12 warrant is sufficiently particularized to pass constitutional muster, then total suppression is

13 required.'" *Kow*, 58 F.3d at 428 (quoting *Cardwell*, 680 F.2d at 78).  In addition, when the valid

14 portion of the warrant is only a "relatively insignificant" part, severance is not possible.  *Id.*

15      After careful consideration and review of the warrant itself, the court concludes

16 the warrant here is severable.  As noted above, the warrant on its face directed the searching

17 officers to seize guns, drugs and gang paraphernalia, all of which were specifically described.

18 JEX A at 3, 4.  As in *Sears*, 411 F.3d at 1130, the warrant contains clear descriptions of material

19 that was either illegal on its face or likely to be evidence of criminal activity.  As also noted, the

20 warrant additionally commands seizure of documents not related to gang association, clothing

21 belonging to the unidentified victim of an unidentified crime, and evidence of crimes yet

22 unknown. JEX A at 3, 4-5.  The inclusion of these broadly worded commands is troubling, but as

23 they are in separate paragraphs of the warrant, they can and should be severed.  *George*, 975 F.

24 2d at 79 (remanding to the district court to determine whether portions of the warrant could be

25 severed, even though warrant included phrase allowing seizure of unknown crime).

26 /////

1      Accordingly, as the warrant is not sufficiently specific as to the following

2   categories, any such evidence is suppressed:  any and all property belonging to the victim; any

3   cleaning chemicals or devices; any and all clothing, apart from black gloves and black ski masks;

4   any and all shoes, apart from shoes with possible blood stain evidence; any medical or dental

5   records, hospital records or billings; and instrumentalities or trace evidence or evidence of

6   unknown crimes.  However, as the paragraphs containing these categories are severable from the

7   rest of the warrant, the motion to quash the seizure of any drugs and related paraphernalia,

8   firearms, gang paraphernalia, black ski masks and gloves, shoes with bloodstains, address books

9   and telephones is denied.

10      C.  _Franks v. Delaware_

11      In _Franks v. Delaware_, the Supreme Court held that when a defendant makes a

12   preliminary showing that a false statement necessary to the finding of probable cause is made

13   knowingly and intentionally, or with reckless disregard for the truth, he is entitled to an

14   evidentiary hearing to explore the allegations of perjury or reckless disregard.  438 U.S. 154,

15   155-56 (1978).  _Franks_ established that intentional or reckless omission of material facts or the

16   inclusion of material falsehoods in a search warrant affidavit violates the Fourth Amendment.

17   Omissions are material if adding the information means that the affidavit no longer supports a

18   finding of probable cause; falsehoods are similarly material if subtracting the information means

19   the affidavit no longer supports the finding of probable cause.  _Id_.; _Baldwin v. Placer Co_., 418

20   F.3d 966, 971 (9th Cir. 2005) (_Franks_ permits a court to purge any falsehoods and determine

21   whether the affidavit still establishes probable cause); _United States v. Garza_, 980 F.2d 546, 551

22   (9th Cir. 1992) (omission is material only when omitted fact casts doubt on existence of probable

23   cause).  It is defendant's burden to establish by a preponderance of the evidence that there are

24   material omissions from or misrepresentations in the affidavit and that this information was

25   essential to a showing of probable cause.  _United States v. Dozier_, 844 F.2d 701, 705 (9th Cir.

26   1988).

1          1.  Surveillance Of Espinoza

2          Defendant asserts four problems with the Affidavit's account of law

3    enforcement's surveillance of Espinoza: (1) Bunch misstates the date when surveillance was

4    begun; (2) Bunch averred he began surveillance on November 22 (or perhaps the 23rd) in order

5    to prove or disprove Espinoza's statement about Khan, but testified that Espinoza did not

6    mention Khan until November 24; (3) the Affidavit's accounts of Espinoza's visits to Khan's

7    house were based on GPS tracking of her car and not "active surveillance" of Espinoza herself;

8    (4) on one occasion, GPS placed Espinoza's car in Stockton while a report of her car's activity

9    (the "stop report") listed the car's location as Modesto.  ECF No. 189 at 3-5.  The government

10   counters that the GPS data was accurate and the probable cause showing would not have been

11   diminished if the Affidavit made clear that "active surveillance" included GPS monitoring of

12   Espinoza's car.

13              a.  Inconsistencies And "Active Surveillance"

14         Defendant takes issue with Bunch's inconsistencies about when the surveillance

15   of Espinoza began and the reasons for it.  *Compare* 5/15 RT 54 (Espinoza did not mention Khan

16   by name until November 24) *and* JEX B at 28 (during 11/24 interview, confirms "Wqas" hit

17   Flores on 10/31) *with* JEX B at 31 (surveillance on Espinoza began on 11/23 "in order to

18   confirm or disprove [her] original statement provided on 11-22-2009, that her [*sic*] and W.

19   KHAN had no relationship").  This drafting is incredibly sloppy but its sloppiness is not

20   material.  Moreover, probable cause to believe that evidence of the Flores homicide might be

21   found in Espinoza's house did not depend on the reason surveillance was undertaken or even

22   when it began, but rather on the results, if verified by the officer.

23         Defendant's claim about the omitted definition of "active" surveillance is

24   similarly not material.  First, it is not clear, grammatically speaking, that Bunch's reference in

25   the Affidavit to active surveillance refers to observations of Espinoza rather than to confirmation

26   that defendant lived at 3372 Penelope Drive.  *See* JEX B at 31 ("During this investigation, it was

1   determined that 3371 Penelope Drive is W. KAHN's [*sic*] residence.  This was confirmed with

2   active surveillance.").  When Bunch next uses the term "active surveillance" it is to describe

3   observations of Espinoza and defendant, not their cars, together.  *Id*. at 32.  Second, even if the

4   lack of definition can be considered an omission, any omission is not material to the showing of

5   the connection between defendant and Espinoza in light of the officers' observations of

6   defendant's walking to Espinoza's back door and entering without knocking, among other

7   things.  *Id*.

8                        b.  GPS[8]

9            In support of his *Franks* motion, defendant provided a "stop report" generated

10  from the GPS device on Espinoza's vehicle, which suggested that the Affidavit's reports of her

11  locations were incorrect.  ECF No. 114 at 22-25 & JEX E.  During proceedings on the motion,

12  the government determined that the original reports it had produced, which contained

13  inaccuracies, were not the reports on which Inspector Bunch had relied.  The government then

14  produced "corrected" GPS reports, which the government's expert testified accurately translated

15  underlying geocoding information.  5/15 RT 56, 78-90.  In his closing brief, defendant focuses

16  on one particular discrepancy in the corrected record and suggests that even the government's

17  expert cannot vouch for the reliability of the tracking information.

18           At the hearing, Bunch testified that on November 30, 2009, he generated a Stop

19  Report from the GPS device attached to Espinoza's car using the Covert Tracking website and

20  relied on that report in preparing the Affidavit.  5/21 RT 63-64.  Bunch identified Government's

21  Exhibit (GEX) 2 as the report, noting he had written "Miranda" at the top of the document.  *Id*. at

22  64 & GEX 2.  He did not rely on JEX E, which has a date of January 2, 2010 on the bottom, in

23  preparing the Affidavit.  5/21 RT 61-62.

24  _____

25      [8]  In his motion to traverse the warrant, defendant cited to several inconsistencies between
    the stop report and the affidavit.  ECF No. 114 at 22-25.  In the closing briefing, however, after the
    government's clarification of the GPS evidence, he cites to a single episode only.  The court limits
26  itself to the single episode.

1       Michael Lugiewicz, who works for GPS Intelligence, testified that his company

2   provides tracking devices to law enforcement and operates the Covert Tracking website.  5/15

3   RT 64-66, 73.  From raw data, including the time of any stop and the latitude and longitude, the

4   company generates a report with the addresses of the stops; the report is stored on servers with

5   only limited access and then put on the Covert Track website, where law enforcement

6   subscribers can retrieve it with a user name and password.  5/15 RT 73-75.  Law enforcement

7   clients cannot manipulate the data.  5/15 RT 86.  Lugiewicz compared the raw data and the

8   report that Bunch ran on November 30, 2009, and found that stop report to be corroborated by

9   the raw data.  5/15 RT 82-83.  He could not explain the discrepancy between the Affidavit,

10  which reported Espinoza's car parked in front of 3489 Salvatore Lane in Stockton at 9:21 a.m.

11  on November 25, 2009, information consistent with the report on which Bunch relied, and the

12  Covert Track print-out in Defendant's Exhibit (DEX) A (the same as JEX E), which showed her

13  car parked at the same time in front of 500 El Vista Ave., Modesto, except to say that the

14  incorrect report could have construed address information erroneously and was "missing

15  information."  5/15 RT 86-91; 6/19 RT 44-45.

16      That two reports generated on two different dates from the GPS tracking device

17  attached to Espinoza's car contain different information, despite apparently reproducing tracking

18  information for the same period of time, raises questions about the reliability of the reports.  But

19  at this stage of the case, the focus is on what Bunch knew or should have known.  On the record

20  before the court, defendant has not borne his *Franks* burden of showing that Bunch's inclusion

21  of the information from GEX A constituted a reckless or intentional omission of material

22  information.  Bunch explained credibly that he relied on the report he printed on November 30,

23  2009, which is consistent with the information in his Affidavit, and explained how he recognized

24  the report on which he relied.  Moreover, as explained above, even if the court does not consider

25  any evidence from the GPS tracking, the probable cause showing is still supported by law

26  /////

enforcement's actually observing Espinoza and Khan together, and observing firsthand Khan's access to Espinoza's house.

Finally, even if in fact there are flaws in the government's witnesses' testimony about the reliability of GPS information, Bunch testified he understood the information was reliable and there is no suggestion he was aware of any contrary opinions concerning reliability.

### 2. Rabbit

In his *Franks* motion, defendant also contends that the material in the Affidavit attributed to William Fry, known as Rabbit, came from a December 10, 2009 interview and not from the November 24, 2009 interview Bunch claimed to be reporting.  ECF No. 114 at 10.  In his closing *Franks* brief, defendant repeats this claim and faults Bunch's failure to include information about Rabbit's criminal record in the Affidavit.  The government argues the latter claim is waived because defendant has not supported the claim with any evidence of Fry's record and that the former claim is not supported by the record.

### a.  Rabbit's Criminal Record

At the evidentiary hearing, Bunch acknowledged that after he spoke to Fry on November 24, 2009, he ran a rap sheet and learned that charges were pending against Fry in San Joaquin County and that a warrant had issued for Fry's arrest.  5/21 RT 9-11.  Nevertheless Bunch assured Fry he would not arrest Fry.  He did not include any information about Fry's record in the Affidavit, although he adamantly denied the omission was a willful attempt to mislead the magistrate.  5/21 RT 12, 14-16.  The government objects to defendant's attempt to raise this issue without providing supporting documentation.  The objection is overruled.

Any omission of information about Fry's record in the Affidavit is not material, in light of relevant precedent addressing the existence of probable cause.  The Affidavit included a detailed description of Fry's extensive participation in Flores's drug operations, including the fact that he carried a gun to provide protection for Flores during any drug deals or even when Flores was partying.  JEX B at 25-27.  The best practice unquestionably would have been for

1    Bunch to disclose Fry's record and Bunch's accommodation of Fry.  That said, what Bunch did

2    disclose gave the issuing state magistrate sufficient information to know Fry's credibility might

3    be questioned, and to judge Fry's credibility.  *See United States v. Martinez-Garcia*, 397 F.3d

4    1205, 1216 (9th Cir. 2005) (stating that officers generally must disclose information suggesting

5    deal struck with informant); *United States v. Avery*, 295 F.3d 1158, 1167-68 (10th Cir. 2002)

6    (stating that omission of informant's criminal record not material because affidavit included

7    information about his use and sales of cocaine); *United States v. Allen*, 297 F.3d 790 (8th Cir.

8    2002) (finding omission of informant's criminal history not material when affiant notified

9    magistrate that informant admitted using methamphetamine and buying ingredients to make

10   methamphetamine).

11                            b.  Bunch's Contacts With Rabbit

12                  Bunch had a lengthy, recorded interview with Fry on November 24, 2009 and

13   another lengthy interview on December 10, 2009, after the warrant had issued in this case.

14   Defendant contends that some information in the Affidavit attributed to Rabbit could have only

15   been obtained in the later December 10 interview.

16                  At the hearing, Bunch testified that the recorded call of November 24 was only

17   one of his contacts with Fry and that the material in the Affidavit was drawn from all of those

18   contacts.  5/21 RT 21, 24-25.  He also testified that he documented some of those contacts in a

19   police report of November 24, 2009, which he inadvertently dated November 24, 2010.  5/21 RT

20   28-29.  The government provided a copy of this report, which is GEX 4, along with a transcript

21   of the November 24 telephone call, which is GEX 3.  The court has compared the report and the

22   transcript with the affidavit and has determined that the information in the Affidavit accurately

23   reflects the information in these two documents.  *See* JEX B at 38-40.  Defendant has not shown

24   that the Affidavit was changed to incorporate later-acquired information.

25                  Defendant also argues the Affidavit is tainted because it implies that the

26   information came from a single contact, rather than multiple telephone calls, with Rabbit.  Any

1   omission in this respect is not material; whether the information was given all at once or over

2   several days does not detract from its reliability.  *See Zambrella v. United States*, 327 F.3d 634,

3   639 (7th Cir. 2003) (finding that officer's mistake as to date of defendant's phone call from the

4   jail was negligence and did not justify *Franks* hearing); *United States v. Whitsell*, No. 09-20236,

5   2010 WL 940035, at *5-6 (E.D. Mich. Mar. 12, 2010) (rejecting claim that statements were false

6   or misleading under *Franks* simply because information in affidavit was not supported by

7   documentary evidence such as photographs or notes); *United States v. Bautista*, No. CR 08–82

8   RSL, 2009 WL 1174492, at *5 (W.D. Wash. Apr. 29, 2005) (recognizing fact that police report

9   prepared after affidavit was more detailed does not necessarily mean affidavit omitted material

10   information), *aff'd*, 437 F. App'x 600 (9th Cir. 2010).

11             3.  Bunch's Presence At Espinoza's Interview

12             Defendant claims that Bunch falsely told the magistrate that he had been present

13   at the initial interview with Espinoza.  This argument appears to conflate law enforcement's

14   contact with Espinoza on November 22 and her arrest on December 2.  *See* ECF No. 189 at 7-9.

15   Defendant chides Bunch for his inability to remember how he could simultaneously be at the

16   briefing before the warrant was executed and also at the traffic stop and arrest of Espinoza on

17   December 2.  *Id*. at 8-9.  Where Bunch was on December 2, however, has nothing to do with the

18   information in the Affidavit.

19             Defendant also appears to argue that Bunch falsely represented he was present at

20   the November 22, 2009 interview of Espinoza.  The Affidavit contains a lengthy account of that

21   interview, noting that Officers Perry and Greibel were present. JEX B at 11-22.  A few isolated

22   phrases suggest Bunch's presence as well.  *Id*. at 12 ("I told M. ESPINOZA we knew of the

23   marijuana").  Bunch claimed at hearing this happened as the result of rogue autocorrect.  5/21

24   RT 104.

25             Even if the Affidavit could be read to suggest that Bunch was present, the

26   suggestion is not material.  An affidavit may be based on hearsay rather than the affiant's

1    personal knowledge.  *Gates*, 462 U.S. at 238-39.  Whether or not Bunch was present, the

2    Affidavit provided the magistrate with sufficient information to gauge the reliability of the

3    information provided.

4                   4.  When Did Espinoza Mention Khan's Fight With Flores

5                   Defendant argues it is "ironic" and "suspect" that Bunch did not memorialize

6    Espinoza's concession that it was defendant who fought Flores on Halloween except in the

7    search warrant.  ECF Nos. 183 at 6 & 189 at 9-10; *see* 5/21 RT 49.  Defendant has not shown

8    that Bunch's failure to memorialize this information constitutes a reckless or intentional

9    omission or falsehood nor has he proven by a preponderance of the evidence that Espinoza did

10   not provide this information on November 24.  *See Whitsell*, 2010 WL 940035, at * 5-6; *United

11   States v. Burroughs*, Criminal No. 12–33 (CKK), 2012 WL 3240656, at *5 (D. D.C. Aug. 10,

12   2012) (defendant's speculation that affidavit included incorrect time chase began not sufficient

13   *Franks* showing); *United States v. Flores*, No. CR 08-0730 WHA, 2011 WL 42896, at *3 (N.D.

14   Cal. Jan. 6, 2011) (rejecting claims that failure to record informant's interview and potentially

15   different dates of interview included in affidavit were material).

16                  5.  Reliance On Urrea's Double And Triple Hearsay

17                  In his motion to traverse the warrant, defendant argues that Bunch's reliance on

18   Urrea's statement that Flores's sister Christine had seen a picture of defendant on Espinoza's

19   MySpace page with the caption "I'm in love with a thug" was improper because there is no

20   independent corroboration the picture existed.  In addition, defendant argues that Urrea's belief

21   that Espinoza set Flores up for a robbery that went bad is not memorialized in any report.  ECF

22   No. 114.  The court did not grant a hearing on this claim.  As noted above, the lack of supporting

23   documentation does not satisfy the necessary *Franks* showing of impropriety.

24           D.  *People v. Galland* And The Integrity Of The Affidavit

25                  Defendant argues that Bunch did not comply with the requirements for

26   maintaining a sealed affidavit established by the California Supreme Court in *People v. Galland*,

                                                     26

45 Cal.4th 354 (2009).  He says he is entitled to suppression based on this non-compliance by itself, and because the irregular handling of the affidavit and the suggestion that more than one version was created make it impossible for the court to determine whether the magistrate relied on the version of the Affidavit currently before this court.

### 1. *Galland*

In *Galland*, the California Supreme Court considered the requirements for the preservation of a sealed search warrant affidavit and concluded that a sealed affidavit may be retained by law enforcement officers only if certain requirements are met.  *Id*. at 368.  In *Galland*, the court also considered the procedures to be followed when a sealed affidavit was lost; indeed, its holding is not based on the Fourth Amendment, but rather on a defendant's due process right to an adequate record for appellate review.  Accordingly, the court did not discuss suppression as the automatic remedy, but noted that "[t]he absence of an affidavit to support an executed search warrant, however, does not invalidate the warrant when 'other evidence may be presented to establish the fact an affidavit was presented, as well as its contents.'" *Id*. at 370 (quoting *United States v. Lambert*, 887 F.2d 1568, 1571-72 (11th Cir. 1989)).

Defendant argues that because Bunch did not meet the *Galland* test for retaining the sealed affidavit, the warrant is void *ab initio*.  ECF No. 114 at 16 n.3.  He also argues that the state rules govern because the warrant was issued by a state magistrate upon application by a state law enforcement officer.  *Id*. at 15 n.2.  He relies on cases rejecting the application of Rule 41 of the Federal Rules of Criminal Procedure to state warrants; he presents no case authority suggesting that a violation of state procedure requires a federal court to suppress evidence.  The government contends that *Galland* is inapplicable because it provides a procedure for recreating a lost affidavit, not for when a sealed affidavit is initially retained by an officer and later filed in the state Superior Court.  ECF No. 127 at 9-11.

In *Virginia v. Moore*, 553 U.S. 164 (2008), the United States Supreme Court considered whether the fact that police violated state law in arresting defendant, rather than

1   citing him for driving with a suspended license invalidated the search incident to the arrest.  The

2   Court said that "whether or not a search is reasonable within the meaning of the Fourth

3   Amendment . . . has never depend[ed] on the law of the particular State in which the search

4   occurs."  *Id*. at 172. (internal citation and quotation marks omitted).  It then concluded that the

5   warrantless arrest and the search incident to that arrest were reasonable under the Fourth

6   Amendment.  *Id*. at 1607.  *See also United States v. Dudek*, 530 F.2d 684 (6th Cir. 1976)

7   ("evidence seized in actual . . . violation or (as here) possible violation of state law may

8   nonetheless be admitted in a federal prosecution whether the violation concerned would not be

9   such as to require suppression of evidence under federal constitutional law, or federal statutory

10  or case law"; holding that failure to make a prompt return and to verify the inventory in violation

11  of Ohio law "have no relation at all to the command of the Fourth Amendment")*; see also*

12  *United States v. Cella*, 568 F.2d 1266 (9th Cir. 1978) (standing is to be determined under federal,

13  not state, law).  Defendant has cited nothing in support of his claim that a state law enforcement

14  officer's retention of a sealed affidavit, later filed in the Superior Court, violates the Fourth

15  Amendment.  Indeed, *Galland* relied on federal authority, which held that "the failure to file and

16  preserve a supporting affidavit in the clerk's office pursuant to Fed. R. Crim. P. 41(g) does not

17  invalidate an otherwise proper search warrant."  *Lambert*, 887 F.2d at 1571-72.  And in *United*

18  *States v. Pratt*, 438 F.3d 1264, 1266 (11th Cir. 2006), the court held "the Fourth Amendment

19  does not prohibit the use of other evidence to establish the existence and contents of a lost search

20  warrant."  The court in *Pratt* declined to accept the defendant's suggestion that the absence of a

21  warrant created a presumption of a Fourth Amendment violation.  *Id*. at 1270.  In light of this

22  authority, this court declines to conclude that any failure by Bunch to comply with the *Galland*

23  procedures entitles defendant to suppression.

24          2.  The Integrity Of The Affidavit

25          Bunch testified that he began to prepare the Affidavit a few days before

26  December 2, 2009, but was working until the early morning hours of that day to finish it.  6/19

1   RT 21-22.  As Bunch was working on the Affidavit, he encountered a "glitch," which capitalized

2   all the "Is".  Ceres Police Detective Yandell copied the Affidavit onto his computer and

3   corrected the Is, but did not otherwise edit or change its substance.  6/19 RT 22.  Bunch and

4   Yandell completed the Affidavit around 4:00 a.m. and left to get a few hours sleep before

5   meeting with the magistrate.  6/19 RT 24.  Bunch returned to the office a little before 7:00 a.m.,

6   retrieved the Affidavit, read it over and then went to the judge's chambers.  6/19 RT 25.

7            The government introduced a report from FBI Agent John Cauthen, who

8   conducted a forensic examination of a thumb drive containing the search warrant affidavit.  GEX

9   16.  Agent Cauthen concluded that the Affidavit was edited over a several-hour period on a

10  computer with the date set to December 2, 2009, and was last printed out at 3:57:00 a.m.  GEX

11  16 at 04306, 04311.  Agent Cauthen printed a copy of the Affidavit, which was included as

12  Attachment 1 to his report.  He also printed a copy of the Affidavit from a temporary folder and

13  included it as Attachment 3.  GEX 16 at 4311.

14           Defendant claims that the report "proves that the warrant submitted to Judge

15  McFadden on December 2, 2012 [*sic*] was not the same warrant that Bunch last altered on

16  December 2, 2012 [*sic*] at 3:47 a.m. [*sic*].  ECF No. 189 at 14.  He relies on differences between

17  GEX 16, Attachment 3, and JEX B; he does not point to any differences between GEX 16,

18  Attachment 1, and JEX B.  He does not explain how the differences between the final version

19  and an auto-save version from a temporary folder demonstrate that the Affidavit presented to

20  Magistrate McFadden was different from the Affidavit filed with the court, nor does he present

21  anything other than speculation that Bunch may have made changes on some other computer that

22  Cauthen did not examine.  Defendant has not borne his burden of showing that the affidavit

23  presented to the state magistrate was different than that ultimately filed with the Superior Court.

24  /////

25  /////

26  /////

IT IS THEREFORE ORDERED that:

1. Defendant's motion to quash the search warrant (ECF No. 110 ) is GRANTED in part and DENIED in part, as discussed above; and

2. Defendant's motion to traverse the search warrant (ECF No. 111) is DENIED.

DATED:  April 3, 2013.

_____

UNITED STATES DISTRICT JUDGE